IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ARINC, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. 1:17–cv–00446–JMC |
| JAMES L. MARTIN, *et al*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This suit arises out of Plaintiff ARINC, Inc.'s employment and termination of Defendant James L. Martin. The parties consented to proceed before a magistrate judge for all proceedings pursuant to 28 U.S.C. § 636 and Local Rules 301 and 302. (ECF Nos. 35 & 36). Pending before this Court is Plaintiff's Motion for Summary Judgment. (ECF No. 39). The Court has reviewed Plaintiff's Motion and Defendants' Response, (ECF Nos. 39, 41), and will, in its discretion, consider Plaintiff's delayed Reply.[1] (ECF No. 43). No hearing is necessary. Loc. R. 105.6 (D. Md. 2018). For the reasons below, Plaintiff's Motion is **GRANTED** as to the breach of contract claim and **DENIED** as to its alternative claim of unjust enrichment.

**I.  BACKGROUND**

Mr. Martin is a former employee of ARINC. (ECF No. 2). On August 10, 2009, Mr. Martin was transferred to ARINC's Asia/Pacific Division as its new Managing Director. (ECF

---

[1] *See Jennings v. Hous. Auth. of Baltimore City*, CIV. WDQ-13-2164, 2015 WL 1085574, at *4 (D. Md. Mar. 10, 2015) ("Local Rule 105.2(a) requires that 'all memoranda in opposition to a motion shall be filed within fourteen days of the service' . . . . However, 'Local Rule 105.2(a) does not provide the consequence for a failure to meet the prescribed deadline. Thus, the district court, in its discretion, may decide whether to consider an untimely opposition.'" *Curtis v. Evans*, No. DKC 2003–2774, 2004 WL 1175227, at *1 (D. Md. May 27, 2004)).

No. 39-3). ARINC informed Mr. Martin that the new role required his temporary international assignment to the Republic of Singapore. (*Id.*). Such temporary international assignments came with terms and conditions (the "Assignment Terms") to assist in an employee's relocation. (*Id.*). Among those Assignment Terms are incentive provisions, such as tax equalization and tax preparation. (*Id.*).

ARINC utilizes tax equalization incentivize employees to accept such temporary international assignments. Tax equalization provides for ARINC to assume any new tax liabilities that arise from the international placement to keep an assigned employee's tax burden relatively unchanged. To achieve this goal, ARINC charged Mr. Martin a hypothetical tax but paid his actual liabilities to the Republic of Singapore, the United States, and the State of Maryland. (*Id.*). And would then conduct a tax settlement equalization calculation to determine the portion of the tax unrelated to the international assignment. Once determined, the international assignee would be sent the tax settlement and, if monies were owned, have to pay ARINC back for the portion unrelated to the international assignment. Occasionally, tax equalization would lead to situations where ARINC provided relocated employees with "advances equal to the estimated or actual amount of taxes," (*Id.* at 8), and in anticipation of needing to provide such advances ARINC included with the Assignment Terms an Acknowledgement of Tax Advance Liabilities, (the "Acknowledgment," collectively with the Assignment Terms, the "Contracts"). The Acknowledgment detailed how such advances constituted "an obligation by" the employee to ARINC and how such advances would be reconciled with a final yearly tax equalization settlement calculation ("Tax Settlement"). (*Id.*). The Acknowledgement obligated an employee to repay any advances "for each taxable year within 60 days after completion of the Tax Equalization Settlement Calculation for the same taxable year" by either applying that year's tax reimbursement or by

reimbursing ARINC by cash or check. (*Id.*). Furthermore, the Assignment Terms, designated an accounting firm, PriceWaterhouseCoopers ("PWC"), to prepare an internationally assigned employee's taxes in conformity with the tax equalization provisions. (*Id.* at 9). In preparation for his assignment to Singapore, Mr. Martin signed the Assignment Terms on August 10, 2009 and signed the Acknowledgement on September 15, 2009. (*Id.* at 7-9).

On January 31, 2013, Mr. Martin's temporary international assignment ended. (ECF No. 41-2). He repatriated to the United States and ARINC terminated his employment. (*Id.*). On February 1, 2013, Mr. Martin executed an agreement with ARINC that permitted him to exercise his stock option in exchange for a waiver of claims against ARINC. (*See* ECF No. 41-7). Notwithstanding his termination, PWC continued to handle Mr. Martin's 2013 taxes in the manner defined by the Contracts. In April 2014, ARINC, through PWC, advanced $105,000.00 the Comptroller of Maryland and $200,000.00 to and Internal Revenue Service to secure extensions for the filing of Mr. and Mrs. Martin's 2013 joint tax returns. (ECF No. 39-1). On January 26, 2016, PWC delivered the Tax Year 2013 Tax Settlement to Mr. Martin that reflected a debt of $261,229.00. The debt has yet to be repaid. (ECF No. 39-2).

ARINC filed this suit in the Circuit Court of Anne Arundel County, Maryland but the Martins removed it to this Court. (ECF Nos. 1 and 2). ARINC now moves for Summary Judgment on the breach of contract claim against Mr. Martin for breach of the Contracts, or alternatively, on the unjust enrichment claim against Mr. and Mrs. Martin for failure to repay monies advanced by ARINC to secure the joint tax return filing extensions. (ECF No. 39).

## II. DISCUSSION

### A. Standard of Review

3

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden "to demonstrate the absence of any genuine dispute of material fact." *Jones v. Hoffberger Moving Servs. LLC*, 92 F.Supp.3d 405, 409 (D. Md. 2015) (internal citations omitted). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F.Supp.35 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The court is "required to view the facts and draw reasonable inferences in the light most favorable to" the nonmoving party, *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)), but must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F.Supp.2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)). And although pro se litigants are given some latitude, "even a pro se party may not avoid summary judgment by relying on bald assertions and speculative arguments." *Smith v. Vilsack*, 832 F. Supp. 2d 573, 580 (D. Md. 2011).

### B. Evidentiary Objections

As an initial matter, ARINC's Reply primarily challenges this Court's ability to consider the information within Mr. Martin's opposition or any of the documents provided with that

4

opposition because the filing lacks any authenticating affidavits.[2] (ECF No. 43). This, however, is no longer the standard dictated by Rule 56. The 2010 amendments to Rule 56 "eliminated the unequivocal requirement that documents submitted in support of a summary judgment motion must be authenticated." *Brown v. Siemens Healthcare Diagnostics, Inc.,* No. DKC 11–0769, 2012 WL 3136457, at *6 (D. Md. July 31, 2012). "Thus, instead of a clear, bright-line rule ('all documents must be authenticated'), Rule 56(c)(2) now prescribes a multi-step process by which a proponent may submit evidence, subject to objection by the opponent and an opportunity for the proponent to either authenticate the document or propose a method to doing so at trial." *Williams v. Silver Spring Volunteer Fire Dep't*, 86 F. Supp. 3d 398, 407 (D. Md. 2015) (internal quotations and citation omitted). Consequently, "the objection [now] contemplated by the amended Rule is not that the material has not been submitted in admissible form, but that it cannot be." *Ridgell v. Astrue,* No. DKC 10–3280, 2012 WL 707008, at *9 (D. Md. Mar. 2, 2012) (internal quotations and citation omitted). ARINC's blanket objection is quintessentially one of form over substance. It does not directly or specifically challenge any content as inadmissible or inauthentic, therefore, the Court may consider Mr. Martin's submissions in resolving this motion for summary judgment.

### C. Breach of Contract Claim

To establish a breach of contract, there must be a contractual obligation owed by the defendant to the plaintiff and a material breach of that obligation. *RRC Ne., LLC v. BAA Md., Inc.*, 413 Md. 638, 658 (2010). ARINC asserts that Mr. Martin was obligated under the Acknowledgment to reimburse ARINC within sixty (60) days of the Tax Settlement and his failure to do so constituted a material breach of the Contracts. (ECF No. 39-1). Under Maryland law,

---

[2] Considering the Defendants' *pro se* status, the Court provided instruction and granted leave for Defendants to correct any deficiencies within the opposition. (ECF No. 44). Defendants, however, did not file any additional authenticating evidence with the Court during the permitted timeframe.

contracts are construed to mean what a "reasonable person in the position of the parties would have thought it meant." *Gen. Motors Acceptance Corp. v. Daniels*, 303 Md. 254, 261 (1985). Whether a contract's language is ambiguous is a question of law that the court answers by asking "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris v. Woods*, 353 Md. 425, 436 (1999). If the language is plain and unambiguous, the Court "must presume that the parties meant what they expressed." *Daniels*, 303 Md. at 261.

Notably, the Martins do not dispute any of the facts alleged by ARINC as a basis for its Motion, (*See* ECF No. 41), thus the Court deems them admitted and details them below. In 2009, the Parties executed the Contracts. (ECF No. 39-3 at 1-9). The Contracts obligated ARINC to pay "any required host county and/or home country income tax withholding required to be made from [Mr. Martin's] compensation . . . to the appropriate taxing authorities." (*Id.* at 8). Then from that total liability, ARINC would assume payment for that which arose from the temporary international assignment and Mr. Martin would remain liable for that which arose separate from the temporary international assignment. (*Id.* at 5, 7, and 8). The Contracts further permitted ARINC to advance payment of an entire tax liability and then seek repayment for the portions that did not arise out of or in connection to the international assignment. (*Id.*).

After Mr. Martin's termination on January 31, 2013, the Parties continued to operate under the terms of the Contracts. The affidavit of Shawna Mueller, the ARINC Senior Human Resources Manager, states that "[i]n 2013, I began communicating with Mr. Martin for the purpose of assisting him in the filing of his 2013 State and Federal tax returns, and to assist ARINC in formulating the [tax settlement] and recovering the monies that would be owed by Mr. Martin under the [tax settlement]." (ECF No. 39-2 at 2). Over the next year, ARINC payed $146,315.00 to the taxing authorities of the Republic of Singapore, as required under the Contracts. (*Id.*). After

6

PWC's requests for information needed to complete the 2013 tax returns went unanswered by Mr. Martin, Ms. Mueller stepped in to help "facilitate communication and ensure completion" of the tax returns. (*Id.*). It was around this time that Mr. Martin engaged an accountant, Cheryl Gallina, to assist with the "tax issues." (*Id.*).

Despite Ms. Gallina's communications on behalf of the Martins, PWC did not have all the information necessary to file the 2013 tax returns by the April 15, 2014 deadline. (*Id.*). Thus, PWC proposed that extensions be filed. (*Id.*). An extension with the Internal Revenue Service does not require the inclusion of extension payments but warns that failure to do so will result in interest and penalties. (ECF No. 39-3 at 16). An extension with the Maryland Comptroller's office does require the inclusion of an extension payment. (*Id.* at 17). On April 9, 2014, Ms. Mueller sent an e-mail to Ms. Gallina and Mr. Martin informing them that the extension applications were attached for their review and ready to be filed. (*Id.* at 10). The e-mail informs Ms. Gallina that the extension payment amounts should be $200,000.00 to the Internal Revenue Service and $105,000.00 to the Maryland Comptrollers. (*Id.*). The e-mail goes on to ask if these amounts "seem more in line with what you were expecting" and for either Ms. Gallina or Mr. Martin to "please let me know by 2pm this afternoon, if at all possible." (*Id.*). The e-mail goes on to state "[a]gain, we will make the payments on your behalf." (*Id.*). Later that day, Ms. Gallina responded to the e-mail stating: "Those amounts sound better. A bit on the higher side than what I estimated for him, but it is better to overpay than underpay in this situation." (*Id.*). After Ms. Gallina's response, Ms. Mueller requested the necessary funds and ARINC advanced $200,000 to the Internal Revenue Service and $105,000 to the Comptroller of Maryland on April 14, 2014. (*Id.* at 12-17).

7

During the next few months, Mr. Martin terminated his engagement with PWC before the 2013 tax return could be completed or filed. (ECF No. 39-2 at 3). Nevertheless, Mr. Martin and PWC continued to communicate regarding the outstanding Tax Settlement as required by the Contracts. (ECF No. 39-3 at 18-19). After some revisions, Ms. Mueller e-mailed Mr. Martin the Tax Settlement document for the 2013 tax year. (*Id.*). The Tax Settlement ultimately set forth a debt of $261,229 owed to ARINC. (*Id.*). Pursuant to the Contracts, Mr. Martin had sixty (60) days to reimburse ARINC for the amounts set forth in the Tax Settlement. (*Id.* at 8). ARINC asserts that as of the date of its Motion, Mr. Martin has yet to reimburse it for the Tax Settlement. (ECF No. 39-2 at 3).

As stated above, Mr. Martin's Response does not dispute any of the facts advanced by ARINC. (*See* ECF No. 41). It does, however provide additional facts to the Court that, when liberally construed, could constitute challenges to the underlying enforceability of the Contracts. Specifically, the Court will construe his letter as challenging enforceability due to his termination and the inclusion of taxes arising from the stock option.

First, and although already included in the above narrative, Mr. Martin's Response informed that Court that he was involuntarily terminated and repatriated on January 31, 2013. (ECF Nos. 41 and 41-2). The Court will construe this to be a challenge to the Contracts' continued enforceability after his termination and repatriation. Ultimately, such an argument is unpersuasive. The Contracts contemplate an assignee's termination and provide that "[t]ermination under any circumstance will require immediate settlement of all outstanding tax, travel and other advances, including borrowed leave time and pro-rated portions of any assignment allowances." (ECF No. 39-3 at 6). Even in a light most favorable to Mr. Martin, the Court views the circumstances as presented to most accurately reflect a good faith attempt at immediate settlement that was

unfortunately marred by miscommunication and delay. Mr. Martin was terminated during the first month of 2013, which left the Parties in a position where they would have to wait for nearly a year before the outstanding 2013 taxes could be addressed. Furthermore, the actual filing of the 2013 tax returns was delayed due to Mr. Martin's failure to provide the necessary information to PWC. This resulted the Parties collaborative filing of extensions. And presumably, Mr. Martin's subsequent termination of PWC before the returns could be filed continued to delay the immediate settlement of the outstanding taxes. Lastly, the Court has trouble assigning this argument meaningful weight when Mr. Martin's conduct reflects one intent on remaining bound by the Contracts.[3] Specifically, Mr. Martin appeared willing, but unable, to satisfy his obligations as set forth by the Contracts — i.e. the March 18, 2015 letter notifying ARINC of his inability to repay the Tax Settlement in full but offering $75,000 in compromise that served as notice of inability to pay as procedurally outlined and contemplated by the Acknowledgement. (*See* ECF Nos. 39-3 at 8 and 41-1). Thus, the Court in unpersuaded by arguments that his termination and repatriation undermined the enforceability of the Contracts under the circumstances.

Second, Mr. Martin explains that much of the 2013 tax burden originated from the post-termination execution of his stock option with ARINC. As construed, the letter argues that this is improper because he was unaware that ARINC would be paying the taxes on the stock options and that it goes against his repeatedly being advised that he would be personally responsible for any such taxes. (ECF Nos. 41). Even through a favorable lens, neither argument is persuasive.

---

[3] Notably, nothing within the Contracts indicates continued use during the tax year was compulsory. The Court can envision a scenario where, after termination and exercising the stock option, Mr. Martin requested that the tax equalization not go forward and that ARINC simply issue him the necessary forms to complete his own taxes. The issue being that then Mr. Martin would have been liable for all of his income taxes in 2013, including those arising from his temporary international assignment.

9

The tax equalization program is designed to simplify an international assignee's tax day. Simply put, an international assignee accumulates two categories of tax burdens: those that arise due to the international assignment (i.e. COLA and relocation allowances) and those that would exist regardless of the international assignment (i.e. Social Security and Medicare). Under the Contracts, ARINC takes responsibility for the former category of burdens, and the assignee retains responsibility over the latter. But the tax equalization program does not stop there. It permits ARINC to initially pay the whole of the liability (both assignment related and not) and then turn around and bill the assignee for that portion of the tax burden that would exist regardless of the assignment. To best effectuate this program and its purpose, ARINC paid for an accounting firm — PWC — to "assist in the preparation and filing of your home and host tax returns, as required, for the tax years during which you are on assignment." (ECF No. 39-3 at 5). Thus, the Contracts provided a mechanism for any tax burdens that arose during an entire tax year so long as the assignee was abroad for some portion of that tax year. Here, Mr. Martin was on international assignment in January of 2013 and therefore any liabilities that arose during 2013 properly fell under the tax equalization program.

The Court is further unpersuaded by claims that Mr. Martin did not know that the stock option liabilities were included or that advisement of personal liability somehow prevents their inclusion. The Court is not convinced that the inclusion of the stock option liabilities came as a surprise. When the Parties were finalizing the applications for extension, Ms. Mueller's e-mail dated April 9, 2014 states: "Apologies for the confusion. Our team was unaware of some large payments made to you, Jim, last year, that were not processed via our regular payroll system. We appreciate you sending the appropriate information to PWC, which appears may have been overlooked when drafting the initial instructions last week." (ECF No. 39-3 at 11). The stock

option payments represent the largest sources of income for Mr. Martin in 2013. (*Id.*). Therefore, at its best, the above reflects that Mr. Martin and Ms. Gallina thoroughly reviewed the projected liability for 2013 and thus had ample opportunity to learn of the inclusion of the stock options. At its worst, the above reflects a situation where PWC initially forgot to include the large stock option payments and Mr. Martin not only reminded them of the income source, but provided the necessary information to include it in the extensions' estimated payments. Although the record is not clear as to which of these two scenarios occurred, either belies any reasonable claim of ignorance by Mr. Martin. Lastly, any assertions that can be construed as Mr. Martin arguing that he should have been personally liable for stock option liabilities, such that the liabilities should not have been included in the tax equalization program, confuses the outcome of the tax equalization program and are unpersuasive. The stock option was exercised during a tax year in which the tax equalization program was in effect. Therefore, they were rightly included within the final Tax Settlement, which assigns ultimate financial responsibility for the liabilities to Mr. Martin. Despite inclusion, Mr. Martin has retained his personal liability over the liabilities since the stock option was exercised.

Nevertheless, it is ARINC's burden to show that there is no genuine dispute of material fact. Here, ARINC has met this burden. The Parties willingly entered into the Contracts which obligated ARINC to pay assignment related tax liabilities and permitted ARINC to execute the tax equalization program to simplify the arrangement. In exchange, the Contracts obligated Mr. Martin to repay, if necessary, any deficient Tax Settlements. After two years of delay, a Tax Settlement for 2013 was issued reflecting a $261,229.00 deficiency. As of January 26, 2015, Mr. Martin had sixty (60) days to repay this debt but has yet to do so. The Contracts remained

enforceable and Mr. Martin's failure to repay the Tax Settlement deficiency constitutes a material breach. Thus, ARINC is entitled to judgment as a matter of Law.

Accordingly, summary judgment is appropriate and ARINC's Motion for Summary Judgment as is **GRANTED** as to its breach of contract claim in the amount of $261,229.00.

### D. Unjust Enrichment Claim

Alternatively, ARINC asked this Court to grant summary judgment as to its claim of Unjust Enrichment if the Contracts were found unenforceable. A claim of unjust enrichment provides a means of relief "when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided." *Dunnaville v. McCormick & Co., Inc.*, 21 F.Supp.2d 527, 535 (D. Md. 1998) (internal quotations omitted) *see also FLF, Inc. v. World Publications, Inc.*, 999 F.Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."). Having found the Contracts enforceable,[4] the Court granted summary judgment on the breach of contract claim, thus the alternative claim for unjust enrichment is **DENIED**.

### III. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, (ECF No. 39), is **GRANTED** as to the breach of contract claim and **DENIED** as to the alternative claim of unjust enrichment. A separate Order shall follow.

Dated: January 30, 2019 /s/
J. Mark Coulson
United States Magistrate Judge

---

[4] The Court notes that even if the Contract were not enforceable, there is no genuine dispute that ARINC made the payments on Mr. Martin's behalf, otherwise giving rise to a valid claim for unjust enrichment in the absence of a valid breach of contract claim.